THOMAS, Judge.
In June 2014, in compliance with Ala. Admin. Code (State Health Planning and Development Agency), Rule 410-1-7-.05, Affinity Hospital, LLC, d/b/a Trinity Medical Center of Birmingham (“Trinity”), filed with the State Health Planning and Development Agency (“SHPDA”) a letter of intent proposing to relocate its radiation-oncology services and two linear accelerators, which were housed at Trinity’s former hospital campus on Montclair Road in Birmingham (“the Montclair campus”), to a new building to be constructed on the new campus of Trinity’s hospital, which is located on Highway 280 (“the Grandview campus”). In November 2014, Trinity filed an application with SHPDA in which it sought a certificate of need (“CON”) to construct a new comprehensive cancer center (“the Grandview cancer center”) on a site on the Grandview campus and to relocate its radiation-oncology services and linear accelerators to that site. Brookwood Health Services, Inc., d/b/a/ Brookwood Medical Center (“Brookwood”), intervened in the proceeding and filed an opposition to Trinity’s plan to relocate its radiation-oncology services to the Grandview campus; Brookwood also requested a contested-case hearing on the matter. SHPDA assigned the matter to an administrative-law judge (“ALJ”), who proceeded to hold a three-day contested-case hearing in March 2015.
The transcript of the contested-case hearing consists of 1,139 pages. The parties introduced exhibits comprising more than 3,300 pages of the 27-volume record. At the conclusion of the contested-case hearing, the ALJ entered a 55-page recommendation containing findings of fact and conclusions of law in which he determined that Trinity’s request was governed by Ala. Admin. Code (SHPDA), Rule 410-2-4-.14, and that Trinity’s CON application met all the required elements for approval. Brookwood filed exceptions to the ALJ’s findings of facts and conclusions of law. SHPDA’s Certificate of Need Review Board (“the CONRB”) held a hearing on the matter on May 20, 2015, and it *347 entered an order approving the requested CON on June 4, 2015, in which it adopted the findings of fact and conclusions of law set out in the ALJ’s recommendation. Brookwood filed a notice of appeal to this court in accordance with Ala.Code 1975, § 22-21-275(6). Brookwood seeks review of the CONRB’s order issuing the CON to Trinity.
As noted above, the record in this case is voluminous. The parties presented testimony and numerous documents to support their respective positions. We will not exhaustively detail the evidence presented; instead, we will summarize the evidence necessary to the resolution of the issues on appeal.
Dr. Elbert Duncan, a radiation oncologist who has practiced at Trinity’s campuses, testified that placing medical oncologists and radiation oncologists at a comprehensive cancer center like the Grandview cancer center would make receiving necessary services easier on cancer patients and would foster better collaboration between doctors, thereby advancing the treatment of their patients. Dr. James Kamplain, another radiation oncologist who has practiced at Trinity’s campuses and who serves as chairman of the Trinity cancer committee, testified that coordination of cancer services in a comprehensive cancer center would facilitate coordinated care; he noted that cancer patients often require both medical-oncology therapy and radiation-oncology therapy, sometimes on the same day, making the proximity of where those services are provided vitally important to their execution. Dr. Kam-plain explained that a comprehensive cancer center like the Grandview cancer center would be a “one-stop shop” allowing for easy communication and coordination of services and treatment. Dr. Jimmie Harvey, a third radiation oncologist who has practiced at Trinity’s campuses, testified that the standard of care for oncology required that medical oncology and radiation oncology be practiced in a comprehensive cancer center.
Dr. Duncan testified regarding the challenges facing Trinity’s radiation-oncology services if they remained housed at the Montclair campus. He explained that the medical oncologists were located in a different building on the other side of the Montclair campus from the building housing the radiation oncologists and that those patients who needed to see both a medical oncologist and a radiation oncologist on the same day for treatment had to travel between the separate buildings, which he described as somewhat difficult, especially for those who were extremely ill or elderly. Dr. Kamplain testified that the physical -distance between the medical oncologists and the radiation oncologists at the Montclair campus had hindered communication between the physicians, nurses, and technicians, which, in turn, had caused issues for those patients receiving combined medical-oncology and radiation-oncology treatment. Dr. Duncan, Dr. Kamplain, and Dr. Harvey testified that requiring cancer patients to travel between medical-oncology offices and radiation-oncology offices (and perhaps a hospital if more critical care was needed during or after treatment) was not ideal for treatment purposes.
Paul Graham, the chief administrative officer of Trinity, testified that he had prepared the projections to support Trinity’s CON application. He said that he based his projections on historical trends and knowledge of the market instead of on population statistics, cancer-incidence rates, or utilization rates. According to Graham, radiation-oncology services are not “money makers” for hospitals. He admitted that providing radiation-oncology *348 services had resulted in a net loss of $7,811 for Trinity in 2013; however, he projected that in the second year of operation of the Grandview cancer center, the center would yield a net income of just over $88,000 based, in large part, on an increase in patient volume. Although Daniel Sullivan, an expert in health-care financial analysis hired by Brookwood to analyze Trinity’s CON application, testified that the projected increase in patients expected by Graham was not reasonable, Marty Chafín, a health-care consultant who testified in favor of Trinity, testified that an increase in patients was not unreasonable, in part because of the expected increase in the over-65 population in the 7-county medical-service area from which Trinity’s radiation-oncology services draws its patients. In addition, Chafín, Rick Kolaczek, the director of radiology and the cancer center at Trinity, and Dr. Duncan all testified that the increase in patients would result from the move to a new one-stop facility offering a multi-disciplinary approach to cancer treatment, which, they all stated, would make the Grandview cancer center more attractive to prospective patients.
The evidence regarding cancer-incidence rates was sharply conflicting. Donald Wise, a health-care analytics consultant, testified that the National Cancer Institute (“NCI”) had reported that the cancer-incidence rates for the seven-county medical-service area Trinity served were either stable or falling. He also opined that the market was “mature” and that little growth was expected because the incidence fates in the largest county in the medical-service area, Jefferson County, were falling. Wise testified that the population of the medical-service area was also stable. Based on that data, Wise opined that Trinity’s projected increase in patients for the Grandview cancer center was not realistic or supported." Jenni Corbett, the director of cancer services for Brookwood, also testified that, in her opinion, the rates of cancer diagnoses at Brookwood’s facility, which is in the same medical-service area as Trinity, had been falling since 2010.
On the other hand, Dr. Duncan testified that, although the cancer-incidence rates in the medical-service area had slowed, the population in the area was aging and cancer is a disease associated with aging. He said that the average age of someone receiving a cancer diagnosis was between 65 and 70 and that the increase in that age group would ultimately result in an increase in cancer-incidence rates over the next 15 years. Dr. Harvey testified that he had experienced a 5-to-10% increase in cancer cases in his practice each year. He explained that cancer was historically un-derreported in Alabama, making NCI’s figures unreliable in his view. Chafín also testified that cancer rates were expected to increase as the aging population did. She further noted that Jefferson. County had the 8th highest new-cancer-incidence rates in the state and that half of the cancer cases in Jefferson County originated in people 65 years of age or older. In fact, she stated that the cancer-incidence rate in Jefferson County was higher than the rate in Alabama as a whole and higher than the national rate.
Sullivan testified that, in his opinion, Ala. Admin. Code (SHPDA), Rule 410-2-4-. 14, which the parties refer to as “the replacement rule,” should not be applied to the CON application for the Grandview cancer center. He explained that Trinity’s earlier use of the replacement rule for its relocation of its hospital “more or less orphaned” the radiation-oncology services left at the Montclair campus. He said that Trinity had had “its shot” at determining what it would replace and that it had chosen not to include the radiation-oncology services in its earlier CON application. According to Sullivan, the CONRB should *349 question whether it wanted to create. a situation where an applicant can “replace a facility piecemeal” or come back after receiving one CON for a facility to request to replace additional services. He opined that replacement should be a comprehensive plan to shut down one facility and relocate it, in its entirety, to a new 'site. Chafin, on the other hand, testified that the replacement rule applied to the CON for the Grandview cancer center because that CON application requested relocation of the existing radiation-oncology services from the Montclair campus to a new facility in the same county and medical-service area.
Trinity presented four examples of CONs that had been granted under the replacement rule. Three of the four examples were replacement CONs granted to nursing homes, and the fourth was a replacement CON granted to a hospital. Two of the nursing-home replacement CONs permitted replacement of the nursing home based on the age and physical conditions or limitations of the existing facilities; the third nursing-home replacement CON was granted because the existing facility had been destroyed by a tornado. The hospital replacement CON was granted based on the age and physical limitations of the existing hospital building. None of the replacement-CON examples provided by Trinity involved moving fewer than all the services offered by the healthcare facility requesting the CON, and none involved a second use of the replacement rule regarding the same facility.
Our standard of review of a decision of the CONRB granting or denying an application for a CON is well settled. Review of agency decisions is governed by Ala. Code 1975, § 41-22-20(k), a part of the Alabama Administrative Procedure Act:
“Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall -not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
“(1) In violation of constitutional or statutory provisions;
“(2) In excess of the statutory authority of the agency;
“(8) In violation of any pertinent agency rule;
“(4) Made upon unlawful procedure;
“(5) Affected by other error of law;
“(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.”
Furthermore, we have explained:
“In reviewing the decision of a state administrative agency, '[t]he special competence of the agency lends great weight to its decision, and that decision must be affirmed, unless it is arbitrary and capricious or not made in compliance with applicable law.’ Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 *350 So.2d 821, 823 (Ala.Civ.App.1993). ‘The weight or importance assigned to any given piece of evidence presented in a CON application is left primarily to the [CONRB’s] discretion, in light of the [CONRB’s] recognized expertise in dealing with these specialized areas.’ State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d 176, 178 (Ala.Civ.App.1999). Neither this court nor the trial court may substitute its judgment for that of the administrative agency. Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App.1993). "This holds true even in eases where the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result.’ Health Care Auth. of Huntsville v. State Health Planning Agency, 549 So.2d 973, 975 (Ala.Civ.App.1989). Further, ‘an agency’s interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.’ Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268 (Ala.Civ.App.1994).”
Colonial Mgmt. Grp., L.P. v. State Health Planning & Dev. Agency, 853 So.2d 972, 975 (Ala.Civ.App.2002).
In its brief on appeal, Brookwood first argues that the replacement rule does not apply to Trinity’s CON application for the Grandview' cancer center because, Brookwood posits, Trinity already used that rule to relocate its hospital from the Montclair campus to the Grandview campus and, Brookwood contends, the rule does not permit Trinity to use the rule a second time to move a health-care service that it omitted from its initial replacement-CON application. Because, according to Brookwood, the replacement rule does not apply, Brookwood contends that Trinity was required to establish that the CON application for the Grandview cancer center complied with the requirements for the establishment of new radiation-oncology services under Ala. Admin. Code (SHPDA), Rule 410-2-3-.04. Trinity and SHPDA argue that Brookwood cannot establish that the replacement rule does not apply because the language of the rule does not contain any single-use limitation and because SHPDA has historically treated the rule as allowing for the replacement of services or facilities. The ALJ and the CONRB agreed with SHPDA’s and Trinity’s position and determined that the replacement rule governed Trinity’s CON application in the present case.
We will begin our analysis by considering the language of the replacement rule, which reads, in its entirety, as follows:
“(1) Replacement is defined as a project for the erection, construction, creation or other acquisition of a physical plant or facility where the proposed new structure will replace an existing structure and will be located in the same county and market area. Replacement does not include the modernization or construction of a non clinical building, parking facility, or any other non institutional health services capital item on the existing campus of a health care facility, provided that construction or modernization does not allow the health care facility to provide new institutional health services subject to review and not previously provided on a regular basis.
“(2) Planning Policies
“(a) The applicant must demonstrate that the proposed replacement is the most cost effective or otherwise most appropriate alternative to provide patients with needed health care services and/or facility improvements.
*351 “(b) The applicant must provide evidence that the proposed square footage, construction cost per square foot, and cost of fixed equipment is appropriate and reasonable for the types and volumes of patients to be served. “(c) The applicant for the proposed replacement must be the same as the owner of the facility to be replaced.
(3) Needs Assessment
“(a) For replacement of a health care facility an applicant must submit significant evidence of need for the project. Evidence of need for the project should include, but is not limited to, one or more of the following:
“1. The existing structure requires replacement to meet minimum li-censure and certification requirements.
“2. There are operating problems, which can best be corrected by replacement of the existing facility.
“3. The replacement of the existing structure will correct deficiencies that place the health and safety of patients and/or employees at significant risk.
“(b) For replacement of hospitals, the occupancy rate for the most recent annual reporting period should have been at least 60 percent. If this occupancy level was not met, the hospital should agree to a reduction in bed capacity that will increase its occupancy rate to 60 percent. For example, if a 90-bed hospital had an average daily census (ADC) of 45 patients, its occupancy rate was 50 percent. (The ADC of 45 patients divided by 90 beds equals 50 percent). To determine a new bed capacity that would increase the hospital’s occupancy rate to 60 percent, simply divide the ADC of 45 patients by .60 (A fraction of a bed should be rounded upward to the next whole bed) The hospital’s new capacity should be 75 beds, a 15 bed reduction to its original capacity of 90 beds.”
Ala. Admin. Code (SHPDA), Rule 410-2-4-.14.
As we begin our analysis, we are mindful that the construction of administrative rules is governed by the same basic rules as those applicable to the construction of statutes; that is, we are bound to look to the plain meaning of the language used in the rule when construing it. See Alabama Medicaid Agency v. Beverly Enters., 521 So.2d 1329, 1332 (Ala.Civ.App.1987) (“The language used in an administrative regulation should be given its natural, plain, ordinary, and commonly understood meaning, just as language in a statute.”). The term “replacement” is clearly defined in Ala. Admin. Code (SHPDA), Rule 410-2-4-.14, to include “the erection, construction, creation or other acquisition of a physical plant or facility where the proposed new structure will replace an existing struc-ture_” Brookwood posits that the use of the words “existing structure” and “health care facility” in the replacement rule indicates that the replacement rule applies only to the replacement of existing structures or health-care facilities. With that general principle, we can agree.
However, Brookwood’s argument takes a rather illogical turn. The radiation-oncology services that Trinity seeks to replace, Brookwood argues, are not an “existing structure” or “health care facility.” The “existing structure” or “health care facility that would qualify under the rule, Brookwood contends, was the entire Mont-clair campus, which Trinity already received a CON to replace, at least in part, with the Grandview campus. Essentially, Brookwood is arguing that the radiation-oncology services that Trinity seeks to move to a new location are somehow disconnected or detached services not offered in an “existing structure” or in a “health *352 care facility,” which, Brookwood contends, requires the conclusion that the replacement rule cannot be applied to Trinity’s CON application for the Grandview cancer center. However, the radiation-oncology services at issue are quite obviously housed in an existing structure on the Montclair campus, In fact, based on the evidence presented at the contested-case hearing, it appears that the radiation oncologists and the linear accelerators are housed in one building on the Montclair campus but the CT and PET scanners used by the radiation oncologists are housed in the former hospital building itself, indicating that the radiation-oncology services, in their entirety, exist in two separate existing structures on the Mont-clair campus. We cannot agree with Brookwood that the radiation-oncology services at issue in the present case are not housed in existing structures that Trinity desires to replace with a new structure.
As an additional argument, Brookwood contends that the replacement rule may be used only once by an entity owning a hospital or health-care facility to relocate that hospital or health-care facility. However, nothing in the language of Ala. Admin. Code (SHPDA), Rule 410-2-4-14, indicates ' that the owner of a health-care facility or hospital, like Trinity, may utilize the replacement rule only once or that it could not move portions of its operations at different times to different locations, depending on need and feasibility. Brook-wood contends that Trinity relied on inap-posite examples of the use of the replacement rule to support the application of the replacement rule to Trinity’s CON application for the Grandview cancer center. Although it is true that the examples of other situations in which the replacement rule has been utilized did not involve a second use of the replacement rule by the same entity and did not involve what Brookwood describes in its appellate brief as “the piecemeal replacement of a specific service within a hospital to a freestanding facility,” that fact alone does not support the conclusion that the replacement rule does not apply in this situation.
SHPDA’s construction of the replacement rule to allow what Brookwood calls “piecemeal” relocation does not do violence to the language of the replacement rule. In addition, a construction permitting multiple uses of the replacement rule is a reasonable interpretation of the replacement rule, to which we are bound to give deference, based on SHPDA’s expertise in the area of health planning and development. Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268 (Ala.Civ.App.1994). We therefore reject Brookwood’s argument that the replacement rule is not applicable to Trinity’s CON application for the Grandview cancer center.[1]
Brookwood next argues that Trinity failed to prove that there existed a substantially unmet public need for the project as required by Ala.Code 1975, § 22-21-264(4). Section 22-21-264(4) sets out the following factors the CONRB should “giv[e] appropriate consideration to” when determining whether there exists a substantially unmet public need for a particular health-care facility or service:
*353 “a. Financial feasibility of the proposed change in service of facility;
“b. Specific data supporting the demonstration of need for the proposed change in facility or service shall be reasonable, relevant and appropriate;
“c. Evidence of evaluation and consistency of the proposed change in facility or service with the facility’s and the community’s overall health and health-related plans;
“d. Evidence of consistency of the proposal with the need to meet nonpa-tient care objectives of the facility such as teaching and research;
“e. Evidence of review of the proposed facility, service or capital expenditure when appropriate and requested by other, state agencies.
“f. Evidence of the locational appropriateness of the proposed facility or service such as transportation accessibility, manpower availability, local zoning, environmental health, etc.;
“g. Reasonable potential of the facility to meet licensure standards;
“h. Reasonable consideration shall be given to medical facilities involved in medical education.”
Additional factors are set out in Ala. Admin. Code (SHPDA), Rule 410-l-6-.06(l), including:
“(a) The need that the population served or’ to be served has for the services proposed to be offered, expanded, or relocated, will be considered. Specific data supporting the demonstration of need shall be reasonable, relevant, and appropriate. In cases involving the relocation of a facility or service, the extent to which a need will be met adequately by the proposed relocation or by alternative arrangements, and the effect of the relocation of the service on the ability of affected persons to obtain needed health care will be examined in determining whether there is a need for the proposed facility or service.
(b) Population Statistics and Growth. Unless clearly shown otherwise, current population estimates or projections published by the Center for Business and Economic Research, University of Alabama, and data from the SHPDA Division of Data Management will be considered to be the most reliable data available. Population factors are normally included within those methodologies contained in the State Health Plan for determining need.
“(c) Current and Projected Utilization in the Area. The current and projected utilization of like facilities or services within the proposed service area will be considered in determining the need for additional facilities or services. Unless clearly shown otherwise, data, where available from the SHPDA Division of Data Management shall be considered to be the most reliable data available.”
According to Brookwood, the evidence presented at the contested-case hearing failed to prove a substantially unmet public need for the relocation of Trinity’s radiation-oncology services to the Grandview cancer center. Brookwood first attacks the evidence presented at the contested-case hearing regarding the utilization of radiation-oncology services in the area, cancer-incidence rates, and population-growth statistics. Brookwood contends that the evidence presented at the contested-case hearing indicated that the number of Trinity’s radiation-oncology patients had been declining over the previous four years, that utilization of the radiation-oncology services offered by other providers had been stagnant and that the other providers have excess capacity, that cancer-incidence rates in the medical-service area were stable or falling, and that only mini *354 mal population growth in the medical-service area was expected. However, Brook-wood reports only one side of the evidence before the ALJ at the contested-case hearing, despite the fact that the evidence on these issues was sharply disputed.
The ALJ determined, based on the evidence presented by Trinity at the contested-case hearing, that the population served by Trinity’s radiation-oncology services would grow 3.2% between 2015 and 2020; in addition, the ALJ determined that the senior population in the medical-service area was expected to increase by 13.4%. Furthermore, based on the testimony of Dr. Kamplain, the ALJ determined that the national incidence of cancer is expected to increase by 45% over the next 15 years. The ALJ noted that Dr. Duncan and Dr. Harvey had testified that they expected an increase in the number of cancer patients in the future and that Dr. Harvey had testified that he had seen a 5-to-10% increase in cancer incidence in his practice each year. The ALJ specifically rejected evidence presented by Brookwood indicating that, according to the NCI, the cancer-incidence rate was stable or falling between 2007 and 2011.[2] The ALJ instead relied on the testimony of local oncologists and especially Dr. Harvey, who explained that the inaccurate or incomplete reporting of cancer in this state reduced the accuracy of the reports of the NCI. The CONRB heard some brief testimony and considered the amassed exhibits before adopting the ALJ’s recommendation; at the hearing before the CONRB, the chairman of the CONRB stated that he personally believed that the over-65 population was increasing and would continue to increase in the future and another member of the CONRB indicated that he personally agreed with Dr. Duncan and Dr. Harvey that cancer rates would increase as the population aged. Thus, although contrary evidence appears in the record, the record contains abundant evidence, which the ALJ and the CONRB found more reliable and more persuasive, in support of the conclusion that there existed substantial need for the Grandview cancer center based on utilization and population statistics.
Brookwood next challenges the financial feasibility of the Grandview cancer center. At the contested-case hearing, Trinity presented evidence indicating that Graham had calculated expected revenue and expenses associated with the Grandview cancer center and that he expected that the Grandview cancer center would be profitable. Other witnesses disputed Graham’s calculations and assumptions; specifically, Sullivan testified that Trinity could not hope to increase its number of radiation-oncology patients to the number Graham had used to make his income projections and that the Grandview cancer center would operate at a large loss. Despite Sullivan’s lengthy testimony to the contrary, the ALJ and the CONRB accepted Graham’s projections, and, because our standard of review of the factual findings of an agency is limited, we cannot revisit that acceptance. Health Care Auth. of Huntsville v. State Health Planning Agency, 549 So.2d 973, 975 (Ala.Civ.App.1989) (indicating that an agency’s determination of the facts may not be revisited even where “the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result”).
Brookwood makes no arguments regarding the other factors set out in § 22-21-264(4) or in Ala. Admin. Code (SHPDA), Rule 410—1—6—.06(1), and we will therefore *355 not address them. We have rejected Brookwood’s argument that the replacement rule set out in Alabama Administrative Code (SHPDA), Rule 410-2-4-.14, was improperly applied to Trinity’s CON application for the Grandview cancer center. Because we cannot reweigh the evidence presented at the contested-case hearing to determine, as Brookwood would have us do, that the evidence does not support the conclusions that there is substantial unmet public need for the Grandview cancer center and that the Grandview cancer center is financially feasible, we affirm the CONRB’s issuance of the CON to Trinity.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.
THOMAS, J., concurs specially.

. Because we have determined that the replacement rule was properly applied by the AU and the CONRB, we will not consider Brookwood’s argument that the CON application failed to meet the requirements of Ala. Admin. Code (SHPDA), Rule 410-2-3-.04, which governs the provision of new radiation-oncology services. See Pleasure Island Ambulatory Surgery Ctr., LLC v. State Health Planning & Dev. Agency, 38 So.3d 739, 745 (Ala.Civ.App.2008) (pretermitting other arguments once a dispositive issue is decided).

. The record reflects that 2011 was the most recent year for which data had been compiled.